**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| REV TECH LABS, LLC d/b/a QUEEN CITY FIN TECH and CAROLINAS FINTECH VENTURES, LP, d/b/a CFV VENTURES, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 3:24-cv-752 |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| CIRRUS SECURE, INC., FRIDESWIDE SQUARE, INC., and individually, DAVID BROOKS, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs, Rev Tech Labs, LLC d/b/a Queen City Fin Tech ("Rev Tech") and Carolinas Fintech Ventures, LP, d/b/a CFV Ventures ("CFV") (collectively "Plaintiffs"), by and through undersigned counsel, hereby submit this Complaint alleging as follows:

## INTRODUCTION

1.      Plaintiffs bring this action to recover damages arising from a fraudulent scheme perpetrated by, among others, Defendant David Brooks.  As set forth more fully herein, Defendant Brooks knowingly and intentionally defrauded Plaintiffs as part of a purported investment into "Cirrus Secure," a business that sells licenses to its proprietary online secure loan document management software (the "Cirrus Software"). Defendant Brooks knowingly and intentionally misled Plaintiffs into believing that they were investing in the business entity under which Cirrus Secure was operated. Based on Defendant Brooks' representations regarding the company's background, revenue history, customers, and assets, Plaintiffs invested monetary and other resources into Cirrus Secure, Inc., the entity they were led to believe operated Cirrus Secure.

Plaintiffs later learned that Cirrus Secure, Inc. was nothing more than a shell entity formed by Defendant Brooks to be used as an instrumentality of his fraudulent scheme. In addition to inducing Plaintiffs to invest in a shell company with no assets, employees, customers, or other viable business operations, Defendant Brooks made numerous fraudulent misrepresentations designed to obtain the benefits of a business accelerator program operated by Plaintiff Rev Tech. In reliance upon Defendant Brooks fraudulent statements, Plaintiff Rev Tech admitted the shell company to the accelerator program, believing the entire time that the business participating in the accelerator program was the entity that operated the Cirrus Secure business.

## PARTIES

2.     Plaintiff Rev Tech Labs, LLC d/b/a Queen City Fin Tech ("Rev Tech") is a limited liability company organized and existing under North Carolina law with its principal place of business located at 222 S. Church Street, Charlotte, County of Mecklenburg, North Carolina.  The members of Rev Tech are all citizens of North Carolina for purposes of diversity jurisdiction because all of the members of Rev Tech are natural persons who are citizens of the United States and domiciled in North Carolina.

3.     Plaintiff Rev Tech is an accelerator entity, that, along with Plaintiff CFV, annually hosts a competitive, award-nominated twelve (12) week accelerator program for post-revenue financial technology and insurance technology startups from around the world. Plaintiff Rev Tech works with each company selected for the accelerator program to formulate a customized roadmap and connect it to the industry's top leaders and subject-matter experts.

4.     Plaintiff Carolinas Fintech Ventures, LP d/b/a CFV Ventures ("CFV") is a limited partnership organized and existing under Delaware law with its principal place of business located at 222 S. Church Street, Charlotte, County of Mecklenburg, North Carolina. Plaintiff CFV is a pre-

seed and seed investor based in Charlotte, North Carolina, and invests in each company selected for its joint accelerator program with Plaintiff Rev Tech.

5. Defendant Cirrus Secure, Inc. ("Cirrus Delaware") is a corporation organized and existing under Delaware law with its principal place of business located at 29025 Upper Bear Creek Rd., Evergreen, Colorado 80439.

6. Defendant Frideswide Square, Inc. ("Frideswide") is a corporation organized and existing under Colorado law with its principal place of business located at 29713 Troutdale Scenic Drive, Unit B2, Evergreen, County of Jefferson, Colorado. Upon information and belief, Frideswide operates the "Cirrus Secure" business, including the website for Cirrus Secure, https://www.cirrussecure.com/. Among other things, the address listed on the website for the Cirrus Secure business is 29713 Troutdale Scenic Drive, Unit B2, Evergreen, County of Jefferson, Colorado. The principal address for Frideswide was listed as 29025 Upper Bear Creek Rd., Evergreen, Colorado 80439, from July 23, 2019, before being updated to the Troutdale Scenic Dr. location on April 8, 2024.

7. Cirrus Delaware and Frideswide are referred to collectively as the "Entity Defendants."

8. Defendant David Brooks is a resident of Evergreen in Jefferson County, Colorado, and the founder and chief executive officer of Cirrus Delaware and Frideswide. Upon information and belief, Defendant Brooks is domiciled in Colorado and he is a citizen of Colorado for purposes of diversity jurisdiction.

9. Defendants Brooks and the Entity Defendants are co-conspirators in a scheme to defraud investors and hide assets.

10. Defendants Brooks and Frideswide are engaged in a joint enterprise and joint venture because they had an alliance to achieve the jointly held purpose of operating Cirrus Secure. At all relevant times, Defendant Brooks had a legal right to control Frideswide and thus the legal right to control Cirrus Secure. Upon information and belief, Defendant Brooks has the legal right to share in the profits of Frideswide.

11. Defendant Brooks is also the alter ego of the Entity Defendants—his closely held companies—and the interests of justice warrant piercing the corporate veil to hold the Entity Defendants liable for the acts of Defendant Brooks and Defendant Brooks liable for the acts of the Entity Defendants.

12. Without the benefit of discovery, which Plaintiffs anticipate will lead to the discovery of additional evidence that Defendant Brooks and the Entity Defendants are alter egos, Plaintiffs allege the following on information and belief in support of Plaintiffs' allegation that the Defendants are alter egos engaged in a joint enterprise and/or joint venture:

   a. As of May 2019, Defendant Brooks and his wife were the sole directors on Frideswide's Board of Directors.

   b. Defendant Brooks is, and has been since at least April 2019, the Chief Executive Officer of Frideswide.

   c. Defendant Brooks is, and has been since its incorporation, the sole director of Cirrus Delaware's Board of Directors.

   d. Defendant Brooks is, and has been since its incorporation, the Chief Executive Officer of Cirrus Delaware.

   e. The Entity Defendants share, or at one point shared, the same principal place of business at either 29025B Upper Bear Creek Rd., Evergreen, Colorado or 29713 Troutdale Scenic Drive, Unit B2, Evergreen, County of Jefferson, Colorado. Frideswide registered the Upper Bear Creek address on or around July 23, 2019, and Cirrus Delaware registered this principal address upon registering as a foreign entity doing business in the state of Colorado on or around March 24, 2020. Cirrus Delaware filed a Statement of Foreign Entity Withdrawal in Colorado on February 23, 2022. Frideswide updated its address to the Troutdale location on April 8, 2024.

4

f.  All Entity Defendants utilized the same "Cirrus Secure" name in government filings—Frideswide registered its trade name in Colorado as Cirrus Secure on or around May 6, 2019, and Cirrus Delaware registered as "Cirrus Secure, Inc." in Delaware on or around January 24, 2020.

g.  Defendant Brooks is the registered agent in Colorado for all Entity Defendants.

h.  Defendant Brooks comingled personal funds with the funds of the Entity Defendants.

i.  Frideswide failed to file the periodic reports required by Colorado law, became officially delinquent on August 31, 2023, and did not cure that delinquency until April 8, 2024.

j.  The Entity Defendants comingled funds and other assets with the funds and assets of one-another and/or Defendant Brooks.

k.  Since its formation, Cirrus Delaware has failed to pay its annual taxes as required by the State of Delaware.

l.  Since its formation, Cirrus Delaware has failed to make periodic filings as required by the State of Delaware.

m.  At all times relevant to this litigation, Cirrus Delaware had no assets, employees, clients, or revenue.

## JURISDICTION AND VENUE

13.  This is a civil action over which this Court has original federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

14.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 as complete diversity of citizenship exists between Plaintiffs and Defendants and the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

15.  The conduct giving rise to this action, as more fully described below, occurred in the Western District of North Carolina.

16.  Venue is proper in this district pursuant to 28 U.S.C. § 1391.

5

## FACTUAL ALLEGATIONS

17.     In or around December 2019, Defendant Brooks submitted an application to participate in Plaintiffs' 2020 accelerator program.

18.     As part of the application to the accelerator program, Defendant Brooks pitched to Plaintiffs an investment in a business, referred to as Cirrus Secure.

19.     Defendant Brooks also represented to Plaintiffs that the same business would be participating in and receiving the benefits of the accelerator program.

20.     As part of his pitch and application to the accelerator program,[1] Defendant Brooks provided Plaintiffs a "one-pager" (the "One-Pager")[2] and PowerPoint presentation with numerous representations about the business in which Plaintiffs would be investing. In addition to other oral representations, the One-Pager and PowerPoint presentation represented that the investee-company had the following attributes:

   a.     The company was a "Software-As-A-Service" business based in Denver, Colorado.

   b.     The company owned, marketed, and sold licenses for an online secure loan document management software (*i.e.*, the Cirrus Software).

   c.     The company had been in the business of generating revenue via the Cirrus Software since 2018.

   d.     The company had a website of www.cirrussecure.com.

   e.     The companies' employees used e-mails addresses with a domain name of cirrussecure.com, such as jd@cirrussecure.com and db@cirrussecure.com, and could be contacted at www.cirrussecure.com/contact.

   f.     As of January 2020, the company was providing services to twenty-five (25) customers, including six of the top 250 banks in the United States.

   g.     The company had $208,000 in 2018 Fiscal Year Revenue.

---

[1] Defendant Brooks submitted the One-Pager to Plaintiffs through an online portal sometime in December 2019 or January 2020.
[2] A true and correct copy of the One-Pager is attached as **Exhibit C** and incorporated by reference in this Complaint.

h. The company had $472,000 in 2019 Fiscal Year Revenue.

i. The company hosted $8 billion in transactions for "household names," including, Zion Bank, Berkshire Bank, Bank of the West, NBH Bank, Advisor Loans, Pursuit, Community CDC, MBFS, Waterstone LSP, Byline Bank, Colorado Lending Source, First State Bank Nebraska, Veritex Community Bank, Prudent Lenders, and Farmers Business Network.

j. The company's Chief Executive Officer was Defendant David Brooks.

k. The company's Chief Strategy Officer was John DeMoss.

l. The company's Chief Technology Officer was Brian Pieslak.

m. The company had at least eight employees as of January 2020.

n. The company had a pre-money valuation of $10 million.

o. The company had previously received an investment or series of investments totaling $1.3 million.

21. Defendant Brooks specifically represented that the company presented to Plaintiffs as part of the accelerator program application that Defendant Brooks submitted to Plaintiffs, which was Cirrus Secure, was the company that would be participating in the accelerator program.

22. Defendant Brooks specifically represented that the company presented to Plaintiffs as part of the accelerator program application Defendant Brooks submitted to Plaintiffs, which was Cirrus Secure, was the company in which Plaintiffs would be investing.

23. Despite continued representations that Cirrus Delaware owned, operated, and was the entity pitched as Cirrus Secure, Defendant Brooks knew that Cirrus Delaware did not operate the Cirrus Secure business.

24. Despite continued representations that Cirrus Delaware owned, operated, and was the entity pitched as Cirrus Secure, Defendant Brooks never intended for Cirrus Delaware to operate the Cirrus Secure business.

25. Upon information and belief, Defendant Brooks always intended for Cirrus Delaware to be a shell entity to be utilized as an instrumentality as part of his fraudulent scheme.

7

26.     Defendant Brooks knew that the Plaintiffs were relying upon his representations and intended for Plaintiffs to rely on his representations regarding the status and history of Cirrus Secure as part of their decision to invest in Cirrus Secure.

27.     Defendant Brooks knew that the Plaintiffs were relying upon his representations and intended for Plaintiffs to rely on his representations regarding the status and history of Cirrus Secure as part of their decision to admit Cirrus Secure into the accelerator program.

28.     Plaintiffs actually and reasonably relied on Defendant Brooks' representations regarding the company's background, operations, revenue, leadership team, existing customer base, and other characteristics as part of their decision to admit Cirrus Secure to the accelerator program.

29.     Plaintiffs actually and reasonably relied on Defendant Brooks' representations regarding the company's background, operations, revenue, leadership team, existing customer base, and other characteristics as part of their decision to invest in Cirrus Secure.

30.     Contrary to the many representations by Defendant Brooks as part of his pitch to Plaintiffs, Cirrus Delaware sold no services, products, or software licenses, and had no revenue, customers, officers (other than Defendant Brooks), employees, assets, website, investors, investment history, capital, or any other basic necessities of an operating business.

31.     Instead, Defendant Brooks created Cirrus Delaware as a shell corporation to defraud Plaintiffs and misappropriate Plaintiffs' time and resources.

32.     Defendant Brooks made the same representations during an interview conducted by Plaintiff Rev Tech's analysts on or around December 16, 2019, in furtherance of his attempts to obtain entry into the accelerator program and induce Plaintiffs' investment in Cirrus Secure.

33.     Defendant Brooks made the same representations during a semi-finalist video interview conducted by Plaintiff Rev Tech on or around December 18, 2019, in furtherance of his attempts to obtain entry into the accelerator program and induce Plaintiffs' investment in Cirrus Secure.

34.     In or around January 2020, Plaintiffs selected Cirrus Secure to participate in Plaintiffs' selection day.

35.     Plaintiffs actually and reasonably relied on Defendant Brooks' representations during his interviews, and in the One-Pager, the PowerPoint presentation and application to the accelerator program, to select Cirrus Secure to participate in selection day.

36.     On or around January 8, 2020, Defendant Brooks emailed Plaintiff Rev Tech, including Rev Tech Founder and Managing Director Dan Roselli, a PowerPoint presentation that Defendant Brooks intended to present at selection day in further pursuit of Plaintiffs' investment in Cirrus Secure. The presentation reiterated Defendant Brooks' prior representations about Cirrus Secure's background, financials, needs, and projections.

37.     Defendant Brooks presented to Plaintiffs on or around January 9, 2020, in Charlotte, North Carolina, at "selection day" in furtherance of his attempts to induce Plaintiffs to invest in Cirrus Secure, at which time Defendant Brooks also answered questions posed by Plaintiffs, representing, among other things, that:

  a.     Cirrus Secure had eight employees, including Defendant Brooks as Founder and CEO, Brian Pieslak[3] as Lead Architect with twenty years of development experience as a developer and chief technology officer at several startups, and Nick Reed as Client Success Leader.

  b.     Cirrus Secure owned an online secure loan document management software—the Cirrus Software.

---

[3] Brian Pieslak is currently listed as the Chief Technology Officer on the Cirrus Secure website. *See* https://www.cirrussecure.com/our-organization/ (last visited August 14, 2024).

c.      Cirrus Secure had validated the Cirrus Software in the marketplace as revenue producing and profitable, including by providing feedback from customers.

d.      Cirrus Secure retained full rights to the Cirrus Software—Cirrus Secure's core technology.

e.      Cirrus Secure was not a party to any Proprietary Information and Invention Agreements that contained exclusions from assignment to Cirrus Secure.

f.      Cirrus Secure's pre-money valuation was $10 million.

g.      Cirrus Secure held a competitive market advantage because it was built by lenders and focused solely on creating loan growth consistent with lenders' credit appetite and regulatory procedures.

h.      Cirrus Secure operated a SaaS business model with a business-to-business market strategy.

i.      Cirrus Secure planned to raise an additional $3 million in capital.

j.      Cirrus Secure intended to use additional capital to work on pricing, distribution, channel partnerships, financial integration services, and sales models.

k.      Cirrus Secure served twenty-five (25) customers, including five of the top 250 United States banks with assets greater than $5 billion.

l.      Cirrus Secure released a new Cirrus Software platform in or around December 2019.

m.      The new Cirrus Software platform had facilitated billions of dollars of loan volume, primarily SBA loans and other government guaranteed debt.

n.      Cirrus Secure was a singular legal entity without subsidiaries.

o.      Cirrus Secure was not party to any joint venture, partnership, or consortium agreements.

p.      Cirrus Secure was not party to any materially important agreements not otherwise listed or disclosed to Plaintiffs.

q.      Cirrus Secure did not experience any material adverse change in its financial positions, prospects, turnover and no known event or matter occurred or was likely to occur to give rise to any such change.

38.     When he submitted the PowerPoint to Plaintiffs, Defendant Brooks knew the representations and omissions to Plaintiffs were materially false and misleading.

39.     Defendant Brooks intended to deceive Plaintiffs into investing money, time, and resources in a shell entity that had none of the operations or attributes that Defendant Brooks pitched to Plaintiffs.

40.     Based on Defendant Brooks's numerous and repeated representations, including those regarding Cirrus Secure's current status, financials, customers, and marketing strategies, Plaintiffs understood and believed that Cirrus Secure had promising potential for expansion and growth.

41.     Plaintiffs offered Defendant Brooks and Cirrus Secure, among other resources, a $40,000 investment and inclusion in its 2020 accelerator program.

42.     On or around January 20, 2020, CFV's Program Director Kaitlin Carpenter emailed Defendant Brooks a draft of the accelerator program Participation Agreement and SAFE[4] (collectively, the "Agreement") at db@cirrussecure.com.

43.     Defendant Brooks exclusively used his db@cirrussecure.com e-mail address to communicate with Plaintiffs regarding the investment opportunity in Cirrus Secure, as well as Cirrus Secure's application to participate in the accelerator program.

44.     Defendant Brooks' use of his db@cirrussecure.com e-mail address to communicate with Plaintiffs further evidences his intent to deceive Plaintiffs into believing that their investment

---

[4] A "Simple Agreement for Future Equity" or "SAFE" is a simplified agreement by which investors can contribute capital to a business entity in exchange for a future equity interest in the business upon the occurrence of a triggering event. SAFEs are often used to provide a company with bridge financing until it can complete an additional capital raise or a sale of the company. SAFEs allow a company to postpone its valuation until a later date to avoid the need to assign the company a value at an early developmental stage. SAFEs are classified as securities by the United States Securities and Exchange Commission.

was in a company that operated the business described on the website domain located at www.cirrussecure.com.

45.     In the original draft of the Agreement, Plaintiffs listed the participant and investee as "Cirrus Secure" in the Participation Agreement and requested that Defendant Brooks insert the investee company's legal name in the SAFE.

46.     On or about January 24, 2020, Defendant Brooks responded to the original draft of the Agreement with proposed edits, including modifying the identity of the Cirrus Secure party to "Cirrus Secure, Inc., a Delaware corporation" in the Participation Agreement and listing Cirrus Delaware as the correct legal entity in the SAFE, thus further misrepresenting that the entity operating the Cirrus Secure business was Cirrus Delaware.

47.     On the same day that Defendant Brooks returned a draft of the Agreement identifying Cirrus Delaware as the entity that operated Cirrus Secure, Defendant Brooks created and incorporated Defendant Cirrus Delaware in the state of Delaware.

48.     Defendant Brooks filed a Certificate of Incorporation for Cirrus Delaware listing Corporate Creations Network, Inc. as its registered agent and detailing authorization to issue 10 million shares of stock. A true and correct copy of the Certificate of Incorporation, certified by Delaware Secretary of State, is attached hereto as **Exhibit A**.

49.     On or around March 24, 2020, Defendant Cirrus Delaware filed a statement of foreign entity authority with the state of Colorado, which was later withdrawn on or around February 23, 2022.

50.     On information and belief, Defendant Brooks was the sole owner and operator of Cirrus Delaware for the entire time it was in operation.

51.     On or around February 5, 2020, after agreeing to a final version of the Agreement, Dan Roselli on behalf of Plaintiff Rev Tech, Defendant Brooks on behalf of Defendant Cirrus Secure, and Nathaniel Clarkson on behalf of Plaintiff CFV signed the Participation Agreement, and Defendant Brooks on behalf of Cirrus Secure and Nathaniel Clarkson on behalf of Plaintiff CFV signed the SAFE. A true and correct copy of the Agreement is attached hereto as **Exhibit B**.

52.     In signing the Agreement, Plaintiffs agreed to "provide[] access to resources, expertise and guidance . . . , including mentors, service providers, subject matter experts and potential investors." Plaintiff CFV further agreed to invest funds in Cirrus Secure in exchange for Cirrus Secure's issuance of the SAFE.

53.     In reliance on the repeated representations of Defendant Brooks regarding the entity that operated the Cirrus Secure business, Plaintiffs invested $40,000 in Cirrus Delaware as contemplated by the SAFE, believing that they were investing in the entity that operated the Cirrus Secure business.

54.     At his request, Plaintiffs wrote the check to Defendant Brooks, which Plaintiffs agreed to do based on Defendant Brooks' representation that he would apply the fund to the entity that operated the Cirrus Secure business.

55.     In signing the Participation Agreement, Cirrus Delaware agreed:

a.     To "remain a C-corporation incorporated under the laws of the State of Delaware."

b.     To "operate its business solely through [Cirrus Delaware] and [Cirrus Secure] w[ould] conduct any future financing activities for [Cirrus Secure] (including an Equity Financing) through [Cirrus Delaware]."

c.     To "not sell, assign, pledge or hypothecate this Agreement or sublet the Premises or any part thereof without the prior written consent of both QCF and CFV."

d.    Governance of the Agreement would be "by the laws of North Carolina" with all actions pursuant to the Agreement having "venue in Charlotte, North Carolina[.]"

56.    In signing the SAFE, Cirrus Delaware agreed:

a.    "If there is an Equity Financing before the termination of this SAFE, on the initial closing of such Equity Financing, this SAFE will automatically convert into the number of shares of SAFE Preferred Stock equal to the Company Capitalization multiplied by the CFV Percentage (also referenced as the 'SAFE Conversion Financing') and this SAFE shall terminate."

- "'**Equity Financing**' means a Financing pursuant to which the Company issues and sells shares of Preferred Stock in an aggregate amount, without ascribing value to the conversion of any Converting Securities, exceeding $500,000 at a fixed per share valuation, including but not limited to, a pre-money or post-money valuation. If the securities issued by the Company are shares of Common Stock, the Investor shall have the right, but not the obligation, to treat such transaction or series of related transactions as an Equity Financing for the purposes of Section 1(a), with appropriate adjustments to all 'Preferred Stock' references to account for Common Stock being issued and sold instead."

- "'**Financing**' is a bona fide transaction or series of transactions that occurs after the date of this Agreement (including a merger, acquisition, business combination, restructuring or similar transaction) with the principal purpose of raising capital, pursuant to which the Company or any of its current or future subsidiaries or parent companies, offers or sells securities (including shares of capital stock, Convertible Securities or other equity securities), other than to its Affiliates or in an Initial Public Offering."

- "'**Company Capitalization**' represents fully-diluted issued and outstanding equity shares as calculated as of immediately prior to the Equity Financing and (without double-counting) includes all: (i) shares of Capital Stock issued and outstanding; (ii) Converting Securities; (iii) all shares of Capital Stock to be issued in such Equity Financing (other than Converting Securities), (iv) issued and outstanding Options and Warrants; (v) Promised Options; and (vi) Unissued Option Pool, excluding increases to the Unissued Option Pool (except to the extent necessary to cover Promised Options that exceed the Unissued Option Pool) in connection with the Equity Financing; and (vii) any other securities that would affect the calculation of fully-diluted issued and outstanding equity shares."

- "'**CFV Percentage**' is six percent (6.0%)."

b.   Cirrus Secure would routinely deliver information to CFV, including among other statements, quarterly and annual financial statements "prepared in accordance with reasonable accounting standards[,]" quarterly "summar[ies] of material financial and strategic developments," "[i]nformation regarding equity or convertible securities, . . . and any other information, documents or information reasonably related to product performance and the financial condition of the Company and reasonably requested by CFV[.]"

c.   Sections II and III of the Participation Agreement "are incorporated by reference and applicable to this SAFE."

57.   Cirrus Delaware further represented in the SAFE:

a.   "The execution, delivery and performance by [Cirrus Secure] of this SAFE is within the power of [Cirrus Secure] and has been duly authorized by all necessary actions on the part of [Cirrus Secure]."

b.   "To its knowledge, [Cirrus Secure] owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others."

58.   For Plaintiff CFV to obtain a return on its investment in the SAFE, the SAFE contemplated, among other triggering events, an Equity Financing Event. To achieve an Equity Financing Event, Cirrus Delaware needed to issue and sell stock shares in an aggregate amount exceeding $500,000. Accordingly, Defendant Brooks' representations that the SAFE funds would be used to invest in Cirrus Secure's business and that Cirrus Secure was owned and operated through Cirrus Delaware were material.

59.   Plaintiffs later learned that Cirrus Delaware could not perform many of the duties required under the Agreement because it was no more than a shell entity designed by Defendant Brooks to defraud Plaintiffs.

60.     Upon information and belief, Cirrus Delaware does not have and has never had any revenue, assets, employees, customers, nor has it filed tax returns or operated as a functional business.  Instead, it has always been a shell corporation.

61.     Upon information and belief, after Plaintiffs tendered the SAFE investment funds, Defendant Brooks comingled the funds with his personal finances and utilized or transferred the SAFE funds to or for the benefit of himself and/or the true entity owning and operating Cirrus Secure.

62.     Defendant Brooks purposefully and intentionally omitted and concealed the identity of the true entity owning and operating Cirrus Secure to induce Plaintiffs to make the investment contemplated by the SAFE.

63.     Defendant Brooks purposefully and intentionally omitted and concealed the identity of the true entity owning and operating Cirrus Secure to induce Plaintiffs to admit Cirrus Secure into the accelerator program.

64.     Starting in or around March 2020, Defendant Brooks began participating in Plaintiff Rev Tech's accelerator program, along with other individuals that Defendant Brooks led Plaintiffs to believe were employees of Cirrus Delaware.

65.     Specifically, Defendant Brooks and his collaborators attended Advisory Board meetings on or around March 25, 2020, April 8, 2020, May 1, 2020, and May 20, 2020, received mentorship, and accepted support and resources to assist in pitches to potential customers and investors.

66.     At each of these meetings, Defendant Brooks provided Plaintiffs' accelerator program advisors and mentors with updates on Cirrus Secure's business, including its cash flow, potential new clients, and Cirrus Software. Based on Defendant Brooks' aforementioned

representations, Plaintiffs continue to reasonably believe that Cirrus Delaware—the party to the Agreement—was the Cirrus Secure entity participating in the accelerator program.

67.     Creating and utilizing various entities in different states with different, unrelated names but which utilized the same trade name, failing to provide any requisite accounting pursuant to the SAFE, and ceasing communications, all allowed Defendants to continue concealing the true identity of Cirrus Secure for several years. Plaintiffs did not and could not have reasonably known the nature or extent of Defendants' fraudulent actions during this time.

68.     Upon information and belief, Defendant Brooks continues to solicit investments from various venture capitalists or accelerator programs and/or raise capital as Cirrus Secure through Frideswide or the creation of new entities.

69.     Despite repeated demands, Defendants have failed to provide any accounting of Cirrus Secure's financial status or how CFV's investment was used.

70.     Notwithstanding the fact Plaintiffs cannot know the precise financial condition of Cirrus Secure or which entity owns and operates Cirrus Secure, based on the above and below factual allegations, Plaintiffs allege at least $600,000 in actual damages, or the equivalent of 6% of Cirrus Secure's representation of its pre-money valuation of $10 million.

71.     Plaintiffs had no reason to know about any of Defendants' misconduct that is at issue in this lawsuit until less than two years ago.

72.     Until at least December 2022, Defendant Brooks successfully and fraudulently concealed that he had fraudulently induced Plaintiffs into investing in Cirrus Delaware, not the entity that operates the Cirrus Secure business that Defendant Brooks led Plaintiff believe they were investing in.

73. Upon information and belief, in 2021 and 2022, Defendant Brooks represented to news organizations—or at least led news outlets to believe—that Plaintiffs had invested in the Cirrus Secure business. *See, e.g.*, https://finovate.com/cirrus-helps-berkshire-bank-deliver-on-sba-and-ppp-lending/.

74. Finally, in the summer of 2024, Defendant Brooks admitted—for the first time—that Cirrus Delaware was not the entity that operated or currently operates the Cirrus Secure business that Defendant Brooks pitched to Plaintiffs to induce Plaintiffs' investment.

75. As for his participation in the accelerator program, Defendant Brooks devised a new misrepresentation in the summer of 2024, by claiming he participated on behalf of Cirrus Delaware, which Defendant Brooks now claims was a "distribution entity."

76. During that same conversation in the summer of 2024, Defendant Brooks sought refuge in the fraudulently induced Participation Agreement and excused his fraudulent conduct by contending it was not a technical breach of the agreement.

## COUNT I - FOR VIOLATIONS OF SECTION 10
## OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5

77. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

78. Plaintiff CFV brings this cause of action against Defendants Cirrus Delaware and Frideswide for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

79. Defendants Cirrus Delaware's and Frideswide's transaction with Plaintiff CFV, as alleged herein, involved the sale of securities by the Defendants.

80. From at least December 2019 through February 5, 2020, Defendants Brooks, Cirrus Delaware, and Frideswide, in connection with the purchase of the SAFE by the use of the means

and instrumentalities of interstate commerce, including but not limited to emails and telephone calls, directly and indirectly: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and omitted facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business that operated as a fraud and deceit upon Plaintiff CFV as purchaser of the SAFE.

81.     At all relevant times, Defendant Brooks acted on behalf of himself and Defendants Cirrus Delaware and Frideswide.

82.     Upon information and belief, Defendant Frideswide was doing business as Cirrus Secure in 2020 and at that time, Defendant Frideswide operated the Cirrus Secure business that Defendant Brooks pitched to Plaintiffs in December 2019 and January 2020.

83.     In December 2019 or January 2020, Defendant Brooks presented the One-Pager and a PowerPoint presentation to Plaintiffs through an online portal.

84.     The One-Pager and the PowerPoint presentation included numerous false representations about the company that Plaintiffs would eventually invest in, including the following:

    a.    The company was a "Software-As-A-Service" business based in Denver, Colorado.

    b.    The company owned, marketed, and sold licenses for an online secure loan document management software (*i.e.*, the Cirrus Software).

    c.    The company had been in the business of generating revenue via the Cirrus Software since 2018.

    d.    The company had a website of www.cirrussecure.com.

    e.    The companies employees used e-mails addresses with a domain name of cirrussecure.com, such as jd@cirrussecure.com and db@cirrussecure.com.

f.      As of January 2020, the company was providing services to twenty-five (25) customers, including six of the top 250 banks in the United States.

g.      The company had $208,000 in 2018 Fiscal Year Revenue.

h.      The company had $472,000 in 2019 Fiscal Year Revenue.

i.      The company hosted $8 billion in transactions for "household names," including, Zion Bank, Berkshire Bank, Bank of the West, NBH Bank, Advisor Loans, Pursuit, Community CDC, MBFS, Waterstone LSP, Byline Bank, Colorado Lending Source, First State Bank Nebraska, Veritex Community Bank, Prudent Lenders, and Farmers Business Network.

j.      The company's Chief Executive Officer was Defendant David Brooks.

k.      The company's Chief Strategy Officer was John DeMoss.

l.      The company's Chief Technology Officer was Brian Pieslak.

m.      The company had at least eight employees as of January 2020.

n.      The company had a pre-money valuation of $10 million.

o.      The company had previously received an investment or series of investments totaling $1.3 million.

85.      On January 9, 2020, Defendant Brooks attended a "selection day" in Charlotte, North Carolina, and pitched an investment in the business that would operate the Cirrus Secure business.

86.      Specifically, on January 9, 2020, Defendant Brooks made the following material misrepresentations about the company that Plaintiffs would be investing in:

a.      The company had eight employees, including Defendant Brooks as Founder and CEO, Brian Pieslak as Lead Architect with twenty years of development experience as a developer and chief technology officer at several startups, and Nick Reed as Client Success Leader.

b.      The company owned an online secure loan document management software—the Cirrus Software.

c.      The company had validated the Cirrus Software in the marketplace as revenue producing and profitable, including by providing feedback from customers.

d.      The company retained full rights to the Cirrus Software—Cirrus Secure's core technology.

e.      The company was not a party to any Proprietary Information and Invention Agreements that contained exclusions from assignment to Cirrus Secure.

f.      The company's pre-money valuation was $10 million.

g.      The company held a competitive market advantage because it was built by lenders and focused solely on creating loan growth consistent with lenders' credit appetite and regulatory procedures.

h.      The company operated a SaaS business model with a business-to-business market strategy.

i.      The company planned to raise an additional $3 million in capital.

j.      The company intended to use additional capital to work on pricing, distribution, channel partnerships, financial integration service, and sales models.

k.      The company served twenty-five customers, including five of the top 250 United States banks with assets greater than $5 billion.

l.      The company released a new Cirrus Software platform in or around December 2019.

m.      The new Cirrus Software platform had facilitated billions of dollars of loan volume, primarily SBA loans and other government guaranteed debt.

n.      The company was a Colorado corporation and a singular legal entity without subsidiaries.

o.      The company was not party to any joint venture, partnership, or consortium agreements.

p.      The company was not party to any materially important agreements not otherwise listed or disclosed to Plaintiffs.

q.      The company was being reorganized as a Delaware corporation and all assets, including the Cirrus Software, would henceforth be owned, operated, marketed, and distributed through the newly-formed Delaware corporation.

r.      The company did not experience any material adverse change in its financial positions, prospects, turnover and no known event or matter occurred or was likely to occur to give rise to any such change.

s.     The company presented to Plaintiffs as part of the accelerator program application Defendant Brooks submitted to Plaintiffs, which was Cirrus Secure, was the company that would be participating in the accelerator program.

t.     The company presented to Plaintiffs as part of the accelerator program application Defendant Brooks submitted to Plaintiffs, which was Cirrus Secure, was the company in which Plaintiffs would be investing.

87.     Defendant Brooks had conveyed the same representations during an interview conducted by Plaintiff Rev Tech's analysts on or around December 16, 2019, in furtherance of his attempts to obtain entry into the accelerator program and induce Plaintiffs' investment in Cirrus Secure.

88.     Defendant Brooks had also conveyed the same representations and during a semi-finalist video interview conducted by Plaintiff Rev Tech on or around December 18, 2019, in furtherance of his attempts to obtain entry into the accelerator program and induce Plaintiffs' investment in Cirrus Secure.

89.     Defendant Brooks knew in December 2019 and January 2020 that his representations to Plaintiffs were false and misleading.

90.     Defendant Brooks made the various false and misleading statements and omissions specified above, which he knew, intended, or recklessly disregarded were misleading because they misrepresented or omitted material facts necessary to make the statements, considering the circumstances under which they were made, not misleading.

91.     Defendants Brooks, Cirrus Delaware, and Frideswide made the false statements with the intent to deceive, manipulate, and defraud Plaintiff CFV.

92.     As a direct and proximate result of the aforementioned wrongful conduct, Plaintiff CFV suffered damages in connection with the SAFE. In reliance on Defendants Brooks', Cirrus

Delaware's, and Frideswide's misstatements and omissions, Plaintiff CFV provided SAFE funds to Defendants.

93.     Plaintiff CFV would not have invested those funds if it had been aware of the misrepresentations and omissions made by Defendants Brooks, Frideswide, and Cirrus Delaware. Plaintiff CFV did not know, and could not in the exercise of reasonable diligence have known, of Defendants Brooks', Cirrus Delaware's, and Frideswide's misstatements and omissions at the time it invested its money into Cirrus Secure.

94.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have suffered substantial economic loss, including but not limited to Defendant's refusal to recognize CFV's 6% ownership stake in Cirrus Secure, a value of at least $600,000.

95.     By reason of the foregoing, Defendants Cirrus Delaware and Frideswide have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff CFV for damages in an amount to be determined at trial.

## COUNT II – FOR VIOLATION OF SECTION 20A
## OF SECURITIES EXCHANGE ACT OF 1934

96.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

97.     Plaintiff CFV brings this cause of action against Defendant Brooks for violations of Section 20(a) of the Act, 15 U.S.C. § 78t(a).

98.     Defendant Brooks acted as a controlling person of Frideswide and Cirrus Delaware within the meaning of Section 20(a) of the Act as alleged herein.

99.     By reason of his position of control and authority as officer and/or director of Defendants Frideswide and Cirrus Delaware, participation in and awareness of Frideswide's and Cirrus Delaware's operations, and knowledge of the false statements and omissions made to

Plaintiffs, Defendant Brooks had the power and authority to cause Defendants Frideswide and Cirrus Delaware to engage in the conduct complained of herein.

100.　Defendant Brooks was able to, and did, control, directly and indirectly, the decision-making of Defendants Frideswide and Cirrus Delaware, including the misstatements and omissions made by and on behalf of Cirrus Secure.

101.　In particular, Defendant Brooks had direct and supervisory involvement in the day-to-day operations of Frideswide and Cirrus Delaware and, therefore, is presumed to have had the power to control or influence the specific actions giving rise to the securities violations as alleged herein, and exercised the same.

102.　As set forth above, Defendants Frideswide and Cirrus Delaware each violated Section 10(b) of the Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position, as a controlling person, Defendant Brooks is liable pursuant to Section 20(a) of the Act.

103.　As a direct and proximate result of Frideswide's, Cirrus Delaware's, and Defendant Brooks' wrongful conduct, Plaintiff CFV suffered damages in connection with its investment.

### COUNT III – FOR VIOLATION OF THE NORTH CAROLINA SECURITIES ACT (N.C.G.S. § 78A-1, et seq.)

104.　Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

105.　Plaintiff CFV brings this cause of action against Defendants Cirrus Delaware and Frideswide.

106.　Defendants Cirrus Delaware's and Frideswide's transaction with Plaintiff CFV, as alleged herein, involved the sale of securities by Defendants Cirrus Delaware and Frideswide. NC Gen Stat § 78A-2(11).

107. In selling the SAFE to Plaintiff CFV, Defendants Cirrus Delaware and Frideswide, through Defendant Brooks, employed a device, scheme or artifice to defraud Plaintiff CFV, as alleged herein, in violation of North Carolina General Statute § 78A8(1).

108. In selling the SAFE to Plaintiff CFV, Defendants Cirrus Delaware and Frideswide, through Defendant Brooks, made untrue statements of material fact and omitted material facts in Defendant Brooks' representations to Plaintiff CFV, as alleged herein, in violation of N.C. Gen. Stat. § 78A-8 (2).

109. The actions of Defendants Cirrus Delaware and Frideswide, through Defendant Brooks, as alleged herein, fraudulently deceived Plaintiff CFV in violation of N.C. Gen. Stat. § 78A-8 (3).

110. The actions of Defendants Cirrus Delaware and Frideswide, as alleged herein, have damaged Plaintiff CFV in North Carolina, in an amount to be proven at trial.

111. Pursuant to North Carolina General Statute § 78A-56, Plaintiff CFV is entitled to an award of reasonable attorneys' fees.

112. Defendants Cirrus Delaware's and Frideswide's false representations, as alleged herein, have damaged Plaintiff CFV in an amount to be determined at triale.

### COUNT IV – CONTROL PERSON LIABILITY (N.C.G.S. § 78A-1(C))

113. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

114. Plaintiff CFV brings this cause of action against Defendant Brooks for the violations of North Carolina General Statute §§ 78A-8(1-3) described above pursuant to North Carolina General Statute § 78A-56(c)(1).

115. As alleged herein, Defendants Cirrus Delaware and Frideswide violated North Carolina General Statute §§ 78A-8(1–3) by and through Defendant Brooks' misrepresentations and omissions to Plaintiff CFV.

116. As a direct and proximate result of Frideswide's, Cirrus Delaware's, and Defendant Brooks' wrongful conduct, Plaintiff CFV suffered damages in connection with its investment.

117. Defendant Brooks, as a director or officer, controlled Defendants Cirrus Delaware and Frideswide, directly and indirectly, and is thus jointly and severally liable, with and to the same extent as Defendants Frideswide and Cirrus Delaware, to Plaintiff CFV for violations of North Carolina's Security Act.

## COUNT V – CONSPIRACY TO DEFRAUD AND FACILITATION OF FRAUD

118. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

119. Plaintiffs bring this cause of action against Defendants Brooks, Frideswide, and Cirrus Delaware.

120. As described above, Defendants Brooks, Frideswide, and Cirrus Delaware entered into an agreement to defraud Plaintiffs and to commit violations of the Exchange Act, and continued their agreement by concealing Defendants' fraudulent actions, omissions, and securities violations.

121. As demonstrated by the actions set forth herein, the Defendants have been and are engaged in a conspiracy to defraud Plaintiffs by creating a shell corporation to solicit investments, take advantage of Plaintiffs' resources, and shield its assets and true business from Plaintiff CFV's SAFE rights.

122. Plaintiffs have been harmed by Defendants' unlawful and fraudulent actions and agreements, in an amount to be proven at trial.

## COUNT VI – FRAUD

123.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

124.    Plaintiffs bring this cause of action against Defendants Brooks, Frideswide, and Cirrus Delaware.

125.    Each Defendant made, authorized, or otherwise caused the misrepresentations or omissions at issue, which are summarized above.

126.    The misrepresentations and omissions set forth with particularity in this complaint were fraudulent and material.

127.    Each Defendant knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made, and each Defendant made the misleading statements with an intent to defraud Plaintiffs, as detailed above.

128.    Defendants had reason to expect Plaintiffs would rely on such misrepresentations and intended that their misleading statements and omissions would fraudulently induce Plaintiffs to invest resources in Cirrus Secure, including via the SAFE with Cirrus Delaware.

129.    Plaintiffs reasonably and detrimentally relied upon Defendants' false representations as detailed above.

130.    Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, that Defendants' statements were false at the time of the misrepresentations and omissions.

131.    Had Plaintiffs known the facts regarding the SAFE, Cirrus Secure, Cirrus Delaware, and Frideswide, they would not have invested the SAFE funds or accelerator program resources.

132.    As a direct and proximate result of Defendants' false representations and omissions, Plaintiffs have suffered damages in amount to be proven at trial.

133.     Based on the valuations provided by Defendant Brooks, Plaintiffs' damages exceed $75,000.

## COUNT VII – FRAUDULENT CONCEALMENT

134.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

135.     Plaintiffs bring this cause of action against Defendants Brooks, Frideswide, and Cirrus Delaware.

136.     Defendant Brooks intentionally omitted and concealed material facts about Cirrus Delaware, including the fact that Defendant Brooks created Cirrus Delaware as a shell entity and that it had no employees, officers, directors, assets, or capital, and that it sold no products, services, or software licenses.

137.     Defendant Brooks had a duty to disclose, rather than omit and conceal, these material facts because Defendant Brooks made other representations to Plaintiffs about the entity in which Plaintiffs would be investing and allowing to participate in the accelerator program.

138.     Without the omitted and concealed facts, the representations by Defendant Brooks were false, deceptive, and/or misleading.

139.     Plaintiffs actually and reasonably relied on the omissions of Defendants Brooks.

140.     The omissions and concealments of Defendant Brooks were material and harmed Plaintiffs because Plaintiffs would not have invested in Cirrus Delaware or allowed Defendant Brooks to participate in the accelerator program if Plaintiffs had known the whole truth, including that Cirrus Delaware was a shell entity.

141.     Defendants, through Defendant Brooks, also made, authorized, or otherwise caused the concealment of other fraudulent, unfair, and deceptive conduct by Defendants, including

intentionally concealing Cirrus Secure's true legal business entity and Frideswide's continued operation of Cirrus Secure, as summarized above.

142. Defendants' concealment of their fraud, including Cirrus Secure's true legal business entity and Frideswide's continued operation of Cirrus Secure, was reasonably calculated to deceive Plaintiffs.

143. Defendants concealed and continued taking actions to conceal the fraudulent conduct with an intent to defraud and deceive Plaintiffs.

144. As a direct and proximate result of Defendants' concealment of their fraudulent conduct and continued actions to conceal diversion of funds and the entity owning and operating Cirrus Secure, Plaintiffs have suffered damages in amount to be proven at trial.

145. Given Defendants' fraudulent concealment of the true corporate structure of Cirrus Secure and Defendants' refusal to provide financial records or to answer questions regarding how CFV's SAFE funds investment was spent, Plaintiffs request the Court order Defendants to provide a full and complete accounting of the Entity Defendants.

146. Based on the valuations provided by Defendant Brooks, Plaintiffs' damages exceed $75,000.

## COUNT VIII – CIVIL LIABILITY UNDER N.C. GEN. STAT. § 1-538.2
## N.C. GEN. STAT. § 14-100

147. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

148. Plaintiffs bring this cause of action against Defendants Brooks Frideswide, and Cirrus Delaware.

149. North Carolina General Statute § 1-538.2 provides a civil remedy for obtaining property or services by false pretenses. *See* N.C. Gen. Stat. § 14-100.

150.    Defendants Brooks, Frideswide, and Cirrus Delaware, intentionally and fraudulently obtained Plaintiffs' investment and accelerator program services, resources, and benefits by false pretenses.

151.    Specifically, Defendant Brooks, on behalf of himself and Defendants Frideswide and Cirrus Delaware, obtained a $40,000 investment from Plaintiff CFV by intentionally and fraudulently misrepresenting that Plaintiff CFV was investing in the entity that owned the Cirrus Secure assets.

152.    Defendant Brooks, on behalf of himself and Defendants Frideswide and Cirrus Delaware, also obtained services and other benefits from Plaintiff Rev Tech by falsely misrepresenting that Defendant Brooks and others were participating in the accelerator program on behalf of the entity that owned and operated the Cirrus Secure business.

153.    In addition to the investment and accelerator program benefits provided by Plaintiffs, Plaintiffs have incurred attorneys' fees and other consequential damages that are recoverable under North Carolina General Statute § 1-538.2, such as salaries and compensation paid to the employees of Plaintiffs CFV and Rev Tech to investigate Cirrus Secure's theft, misrepresentations, and misconduct.

## COUNT X – UNJUST ENRICHMENT

154.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

155.    Plaintiffs bring this cause of action against Defendants Brooks and Frideswide.

156.    Defendants Brooks and Frideswide were unjustly enriched by their wrongful acquisition and retention of Plaintiffs' investment and resources. Despite Cirrus Delaware, by and through Defendant Brooks, entering into the Agreement with Plaintiffs, Defendants Brooks and

Frideswide reaped the benefits of the SAFE investment and accelerator program falsely presenting themselves and/or their employees as Cirrus Secure.

157.    Plaintiffs conferred a measurable benefit on Defendants Brooks and Frideswide as part of the accelerator program, including Plaintiffs' expenditure of significant time and resources to coach Defendants' employees and executives, including Defendant Brooks, utilization of their relationships to introduce Defendants to additional potential investors and customers, directly increasing Cirrus Secure's value, and providing a financial investment. As described herein, Defendants misled Plaintiffs into believing Plaintiffs' investment and resources were provided to Cirrus Delaware in exchange for the SAFE. Instead, Frideswide knowingly and voluntarily accepted the benefits described above, despite their knowledge that these benefits were intended exclusively for the counterparty to the SAFE.

158.    Plaintiffs did not gratuitously provide investment and other benefits to Defendants Brooks or Frideswide. Instead, Plaintiffs provided investment and other benefits to Cirrus Delaware—the entity Defendants misled Plaintiffs to believe was the entity owning and operating Cirrus Secure—with the expectation that they would receive an interest in Cirrus Secure through the SAFE.

159.    As described herein, the circumstances of Defendants' participation on Plaintiffs' accelerator program and the relationship between the parties show that the benefits Plaintiffs conferred give rise to a legal or equitable obligation on Defendant Brooks and Frideswide to account for benefits Defendant Brooks and Frideswide received.

160.    It would be unjust to allow Defendant Brooks and Frideswide to retain the investment and other benefits they received from Plaintiffs. Plaintiffs are therefore entitled to money damages from Defendants Brooks and Frideswide.

## COUNT XI – UNFAIR AND DECEPTIVE TRADE PRACTICES

161.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

162.    Defendants engaged in numerous unfair and deceptive business practices that were in or affecting commerce and proximately caused actual injury to Plaintiff Rev Tech and its business.

163.    On numerous occasions, Defendant Brooks—on behalf of himself and the Entity Defendants—represented to Plaintiff Rev Tech that Defendant Brooks was applying for admission to Rev Tech's accelerator program on behalf of the entity that operated the Cirrus Secure business.

164.    Then, Defendant Brooks attended, participated in, and benefitted from the accelerator program as if he was representing the entity that operated the Cirrus Secure business. Defendant Brooks even brought other participants to the program and intentionally led Plaintiff Rev Tech to believe that those participants were employees or representatives of the entity operating the Cirrus Secure business.

165.    In a PowerPoint presentation that Defendant Brooks presented to the advisory board for the accelerator program in March 2020, Defendant Brooks continued to represent that he was participating on behalf of the entity operating the Cirrus Secure business and stated that the "Company Objective for the Program" was "$1m revenue FY20."

166.    In one slide titled "Why Cirrus?," Defendant Brooks listed several attributes of the business that Defendant Brooks had misled Plaintiff Rev Tech into believing was participating in the accelerator program:

      a.      "Deep Domain Expertise. By Lenders, For Lenders";

      b.      "Flexible, standalone, cloud-based: new loan system not required";

c.     "Enterprise-level Onboard/Live Support not often seen in Commercial Lending"; and

d.     "Committed to Social Impact by accelerating GDP growth."

167.    The same slide listed Defendant David Brooks as the CEO, Nick Reed as the Client Success Leader, and Brian Pieslak as the Lead Architect.

168.    Plaintiff Rev Tech later learned that Cirrus Delaware—the entity that signed the Participation Agreement—had no employees and did not operate the business described by Defendant Brooks.

169.    The same PowerPoint continued to represent that the company participating in the accelerator program was "[c]urrently handling ~$5 Billion in loan transactions," and "[c]reates 10-20 hours of 'found time per deal." According to the same PowerPoint, the company participating in the accelerator program had "[c]lients seeing 50-100% productivity gains/10-20x ROI," "[d]eployed at six of the 250 largest U.S. banks," and "[a]ddresses cost, growth, engagement, regulatory issues."

170.    Plaintiff Rev Tech later learned that Cirrus Delaware had no revenue, customers, or clients, and no business operations.

171.    As more fully alleged above, Plaintiff Rev Tech later discovered that Defendant Brooks' representations were false and that Cirrus Delaware was a shell corporation with no operating business.

172.    The misrepresentations and omissions by Defendants Brooks—on behalf of himself and the Entity Defendants—were material because Plaintiff Rev Tech would not have permitted Defendant Brooks or any other person to participate in the accelerator program on behalf of a shell corporation.

173. Plaintiff Rev Tech actually and reasonably relied on Defendant Brooks' misrepresentations and reasonably believed that he was participating in the accelerator program on behalf of the entity that operated the Cirrus Secure business.

174. The misrepresentations, omissions, and acts of Defendant Brooks were made intentionally, or at a minimum, Defendant Brooks' misrepresentations, omissions, and other acts had the tendency or capacity to mislead and created the likelihood of deception.

175. In addition to being deceptive, using deception to gain admission to and participate in a highly sought after accelerator program is unfair because it offends public policy and the practice is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff Rev Tech and others.

176. The unfair and deceptive acts and practices by Defendant Brooks were in and affecting commerce because the acts impacted the business activities of Plaintiff Rev Tech, other participants in the accelerator program, and other applicants to the accelerator program that could have participated in place of Defendants.

177. The unfair and deceptive acts and practices of Defendants proximately caused actual injury to Plaintiff Rev Tech because it expended time and resources on Defendants through the accelerator program based on Plaintiff Rev Tech's reasonable belief that Defendant Brooks was participating on behalf of the entity the operates the Cirrus Secure business.

178. The unfair and deceptive acts and practices of Defendants also harmed Plaintiff Rev Tech because Plaintiff Rev Tech would—if it had known the truth—allowed a different company to participate in the accelerator program.

179. In addition to actual damages, Plaintiff Rev Tech seeks treble damages, punitive damages, and its attorneys' fees under North Carolina law.

## JURY DEMAND

180.    Plaintiffs hereby demand a trial of this action by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Rev Tech Labs, LLC d/b/a Queen City Fin Tech and Carolinas Fintech Ventures, LP, d/b/a CFV Ventures respectfully pray for relief as follows:

a.     for a finding in favor of Plaintiffs against Defendants, jointly and severally;

b.     for an award of damages in an amount to be proven at trial;

c.     for an order requiring Defendants produce an equitable accounting to demonstrate the financial status of the Entity Defendants;

d.     for punitive damages;

e.     for a constructive trust over all property and funds that rightfully belong to Plaintiffs;

f.     for costs of litigation and reasonable attorneys' fees against Defendants;

g.     for an order requiring Defendants Brooks and Frideswide to perform a specific accounting tracing the subject investment funds; and

g.     for any such other and further relief as the Court may deem just and proper.

[*Signature Page to Follow*]

Respectfully submitted this 16th day of August 2024.

**WAGNER HICKS PLLC**

s/ Sean C. Wagner
Sean C. Wagner (N.C. State Bar No. 50233)
Jonathon D. Townsend (N.C. State Bar No. 51751)
831 E. Morehead Street, Suite 860
Charlotte, NC 28202
Telephone: (704) 705-7358
sean.wagner@wagnerhicks.law
jonathon.townsend@wagnerhicks.law

*Attorney for Plaintiffs Rev Tech Labs, LLC d/b/a*
*Queen City Fin Tech and Carolinas Fintech*
*Ventures, LP, d/b/a CFV Ventures*